# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**ROBERT J. ZIELINSKI,**   Case No. 4:19 CV 2428

    Plaintiff,   Judge Benita Y. Pearson

    v.   Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.   **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Robert J. Zielinski ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 17, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May and June 2016, respectively, alleging a disability onset date of May 1, 2013[1]. (Tr. 257-71). His claims were denied initially and upon

---

1. Plaintiff filed a prior application for benefits, asserting disability as of May 4, 2013, which was denied on February 11, 2016. *See* Tr. 16. The ALJ in the instant case thus dismissed Plaintiff's claim for disability for the previously-adjudicated period of May 4, 2013 through February 11, 2016 as *res judicata. Id.* Plaintiff does not challenge this determination. *See* Doc. 12, at 3 n.1. The ALJ's decision thus addresses the previously-unadjudicated period of May 1 to May 3, 2013 and from February 12, 2016 through the date of the ALJ's decision. *See* Tr. 16.

reconsideration. (Tr. 156-71, 178-82). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on July 5, 2018. (Tr. 33-75). On August 29, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on October 17, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1966, Plaintiff was 47 years old on his alleged onset date. *See* Tr. 265. Plaintiff had a high school education and attended some college. (Tr. 41).

Plaintiff testified he drove limited distances and did not drive on the freeway, at night, or in rain or snow due to vision issues. (Tr. 40-41). He estimated he drove two to four times per week. (Tr. 41). At the time of the hearing, Plaintiff was working eight to ten hours per week putting up signs in stores to advertise products. (Tr. 43-45). He did this job two days per week, driving between stores; the furthest he had to drive was 20 miles. (Tr. 44). Plaintiff's schedule was flexible and he could do it at any time during a week. (Tr. 44-45).

Plaintiff believed he was unable to work full time due to Meniere's disease, which caused balance issues and vertigo episodes. (Tr. 45-46, 64-65). He had vertigo episodes five to nine times per month. *Id.* During these episodes – which lasted anywhere from five minutes to nine hours – Plaintiff had to lay still and stare at an object in the room. (Tr. 46-47). The dizziness sometimes caused him to vomit. (Tr. 47). Plaintiff also had some hearing loss from Meniere's disease; he heard a humming or ringing sound in his left ear, but his hearing varied. (Tr. 48-49, 67-68). Plaintiff's vertigo episodes had increased since his prior disability hearing. (Tr. 65).

Plaintiff also had vision difficulty; his left eye was "like paralyzed." (Tr. 49). Some days he had no vision in that eye, some days it was blurry; he had no peripheral vision on the left side. (Tr. 50). Plaintiff had these problems for approximately three years, and it was gradually worsening. *Id.* Plaintiff estimated that seven out of ten days his left eye would not open in the morning. (Tr. 64). This usually lasted for thirty minutes to an hour. *Id.* Other times, it opened, but not completely. *Id.* Plaintiff also had difficulty with depth perception at times. (Tr. 65).

Earlier that week, Plaintiff testified he went to work for a few hours after getting up "slowly". (Tr. 59). He went to four places in the same town. *Id.* His left eye was closed during this time. *Id.* Plaintiff stated he typically microwaved food, ordered food, or a friend would bring food over. (Tr. 60). He cleaned his own house, but it took a long time. *Id.* He was able to vacuum, clean the bathroom, and do his own laundry, but someone else mowed the lawn. (Tr. 61). When Plaintiff visited his mom, he drove her to the grocery store and waited the car. (Tr. 62).

Relevant Medical Evidence

*Meniere's Disease*

Plaintiff suffered from Meniere's disease, which affected his hearing and his balance. *See* Tr. 371-73, 473-80, 591-601 , 747-49.

*Vision Problems*

In May 2016, Plaintiff had an eye examination at which he complained that his left eye "want[ed] to close all the time" and that he had difficulty with night vision. (Tr. 400). Plaintiff was noted to have ptosis in his left eye, and cataracts in both eyes. (Tr. 402-03). His corrected near vision was 20/20 in both eyes, and corrected distance vision was 20/30 on the left and 20/25 on the right. (Tr. 402).

In June 2016, Plaintiff saw an ophthalmologist for left eye spasms. (Tr. 446). He reported the spams were "so bad at times that he cannot open his eye" and that they worsened over the prior three months. (Tr. 446). Plaintiff also reported vision blurring, trouble with left peripheral vision, and difficulty driving at night due to glare from oncoming lights. *Id.* The ophthalmologist diagnosed blepharospasm with severely dry eyes, and cataracts in both eyes. (Tr. 450).

Plaintiff returned in October 2016 and underwent a Botox injection for his blepharospasm. (Tr. 519-23). The following month, he reported his left eye had been closed for six days and it was difficult to open; he was also experiencing vertigo due to his Meniere's disease. (Tr. 515). The provider prescribed medication and eye drops, and noted the Botox "may have been too much on left . . . side – got droopy." (Tr. 518). In December, Plaintiff reported he was very sensitive to light; his left eye was itchy and burning and he could barely open it. (Tr. 587). One week later, Plaintiff reported difficulty driving ("glare from oncoming traffic makes it hard to read street signs while driving at night") and that his left eye "closes by itself all the time." (Tr. 581). The provider noted his blepharospasm was "still persisting but better" and his dry eyes were also somewhat improved. (Tr. 585). He received a new glasses prescription. (Tr. 583). In January 2017, Plaintiff again reported glare with headlights when driving; he also reported his left eye had been completely closed for the last year, he experienced dizziness when opening his eyelid. (Tr. 577).

In February 2017, Plaintiff underwent a neurological evaluation with Robert Brocker, Jr., M.D., due to his left eye ptosis, vertigo, and blurred left eye vision. (Tr. 549). Dr. Brocker observed "severe ptosis of the left eye and decreased ROM of the left eye with amblyopia and . . . blurred vision with that and minimal pupillary reaction." (Tr. 552). He was "starting to get some ptosis of the right eye in addition." *Id.* Dr. Brocker ordered a brain MRI and noted Plaintiff "may have some

4

cranial neuropathy evolving from a prediabetic condition." (Tr. 553). Brain MRIs revealed "2 foci of hyperintensity at the L frontal supraventricular white matter". (Tr. 676).

In April 2017, Plaintiff saw Karla Madalin, M.D., on referral from Dr. Brocker. (Tr. 672). On examination, Dr. Madalin noted Plaintiff had ptosis, greater in his left than right eye, with extraocular movements intact. (Tr. 675). She diagnosed, *inter alia*, left eyelid ptosis, and ordered blood work and a spinal MRI. (Tr. 677).

That same month, Plaintiff reported he was unable to see out of his left eye "due to spasms". (Tr. 572). He was unable to open the eye. (Tr. 574). He underwent a Botox injection. (Tr. 575).

In June 2017, Plaintiff told Dr. Madalin his symptoms were worse at night and worse with activities such as reading. (Tr. 650). Dr. Madalin noted "no change" in Plaintiff's left eye ptosis (Tr. 650) at one point in her record and "progressively worsening ptosis" later in the same record (Tr. 659).

In July 2017, Plaintiff saw Linda Ohsie-Bajor, M.D., on referral from Dr. Madalin. (Tr. 689). Plaintiff reported occasional itching and watering in his left eye, as well as difficulty opening the eye. *Id.* He drove a limited amount during the day, but not at night. *Id.* He further reported Botox had not helped. *Id.* His best corrected vision was 20/50 in his right eye, and between 20/80 and 20/200 in his left eye, which was difficult to measure due to his ptosis. *Id.* Dr. Morgan diagnosed ptosis of both eyelids, blepharospasm, and cataracts; he referred Plaintiff to neuro-ophthalmology for evaluation to rule out potential neurological causes. (Tr. 691).

In September 2017, Plaintiff saw Michael Morgan, M.D. (Tr. 685). Plaintiff reported "fluctuation in left eye drooping", as well as double vision. *Id.* His corrected vision was 20/40 in the right eye, and 20/50-2 in the left. *Id.* Dr. Morgan noted the etiology of Plaintiff's ptosis was "extremely difficult to discern", and ocular myasthenia gravis "is a concern." (Tr. 687). He

5

recommended electrodiagnostics, but first wanted to wait and see if there was change over time; he instructed Plaintiff to return in three to four months. *Id.*

In October 2017, Plaintiff continued to reporting "having trouble keeping the left eye open" and that his vision "comes and goes in the left eye". (Tr. 567).

In February 2018, Plaintiff told Dr. Brocker he had difficulty seeing "if it snows and its bright outside". (Tr. 560). On examination, he had "left flaccid facia hemiparesis, still with some decreased ROM of the left eye and amblyopia also, with some blurred vision there." (Tr. 562). Dr. Brocker diagnosed cranial neuropathy and noted Plaintiff was to see a neuro-ophthalmologist. *Id.*

That same month, Plaintiff followed up with Dr. Morgan. (Tr. 681). Plaintiff stated that some days his left eye did not open at all, and he had noticed some drooping in his right eye recently. *Id.* He described his ptosis as about the same, and denied diplopia and blepharospasm. *Id.* His corrected vision was 20/50 on the right and 20/60 on the left. (Tr. 682). Dr. Morgan noted his leading concern was ocular myasthenia gravis and ordered electrodiagnostic testing with neuromuscular neurology. (Tr. 683). He diagnosed ptosis of both eyelids, blepharospasm, cataracts, and myopia, all of which were "stable". *Id.*

*Opinion Evidence*

In September 2016, State agency physician Leon Hughes, M.D., reviewed Plaintiff's records and offered a physical residual functional capacity. (Tr. 101-06). He opined Plaintiff had severe impairments of, *inter alia*, vestibular systems disorders, cataracts, and loss of visual efficiency or visual impairment. (Tr. 101-02). He opined Plaintiff had limited far acuity in both eyes, noting Plaintiff's corrected distance vision was 20/25 (right eye) and 20/30 (left eye) and corrected near vision was 20/20 in both eyes. (Tr. 105). He noted: "[p]tosis of the left eyelid is present, so driving is limited to frequent." *Id.* Dr. Hughes further noted Plaintiff had limited hearing

6

in his left ear, stating again that "[d]riving is limited to no more than frequent". *Id.* He noted Plaintiff had an average hearing threshold of 40 decibels in the left ear and 83 decibels in the right ear, with a word recognition score of 44 percent on the left and 80 percent on the right. *Id.* Dr. Hughes explained the prior ALJ's "RFC is not being adopted because the [claimant] has been [diagnosed] with cataracts, back strain/sprain, and [right] shoulder impingement." (Tr. 106).

In December 2016, State agency physician Stephen Sutherland, M.D., reviewed Plaintiff's records and offered a residual functional capacity opinion. (Tr. 132-36). Like Dr. Hughes, he found severe impairments of, *inter alia*, vestibular systems disorders, cataracts, and loss of visual efficiency or visual impairment. (Tr. 132). He similarly limited Plaintiff to frequent driving due to ptosis of the left eyelid and limited left ear hearing. (Tr. 135-36). Dr. Sutherland opined Plaintiff should "not be exposed to prolonged background noise 70 dB or higher to protect remaining hearing." (Tr. 136). He repeated Dr. Hughes's statement about not adopting the prior RFC. *Id.*

VE Testimony

A VE appeared and testified at the administrative hearing. (Tr. 69-72). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 70. The VE responded that such an individual could perform Plaintiff's past work as a retail store manager and could also perform jobs such as a cashier, sales attendant, and routing clerk. (Tr. 71). The VE also testified such an individual could perform sedentary jobs such as general office clerk, receptionist/information clerk, or inspector/tester/sorter. (Tr. 71-72). The VE further opined that the tolerance for being off-task is "below 15%" and the tolerance for absenteeism is no more than one day per month. (Tr. 72). When asked whether adding a restriction to the hypothetical to "reduce the noise to avoiding even moderate exposure" (Tr. 72), the VE testified the cashier, sales

attendant, and identified sedentary jobs would be eliminated, but such an individual could still perform the routing clerk job (Tr. 73).

ALJ Decision

In his August 29, 2018 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2021 and had not engaged in substantial gainful activity since his May 1, 2013 alleged onset date. (Tr. 18). The ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; Meniere's disease of the left ear; bilateral cataracts with loss of visual efficiency; ptosis of the left eyelid; obesity; degenerative joint disease of the left knee; and torn glenoid lebrum, impingement syndrome, undersurface tear of rotator cuff, minimal osteoarthritis, and synovitis of the left shoulder. (Tr. 19). The ALJ found, however, that none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then found Plaintiff had the RFC:

> to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), with limitations as follows: Occasionally overhead reaching on the left; frequent reaching in other directions on the left; occasional ramps and stairs; no ladders, ropes, or scaffolds; occasional balance, stoop, kneel, crouch, and crawl; occasional exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle; avoiding concentrated exposure to vibration; a moderate noise environment; and frequent pushing and pulling with the left upper extremity.

(Tr. 20). The ALJ then concluded Plaintiff could perform his past relevant work as a retail store manager as that job is generally performed. (Tr. 23). The ALJ alternatively found that given Plaintiff's age, education, work experience, and RFC, there were other jobs existing in the national economy that Plaintiff could perform such as cashier (with 800,000 jobs nationally), sales attendant (with 210,000 jobs nationally), and routing clerk (with 41,000 jobs nationally). (Tr. 25). Therefore, the ALJ found Plaintiff not disabled. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision. First, he contends the ALJ erred in not explaining his finding of less restrictive hearing limitations than offered by a prior ALJ's RFC. Second, he argues the ALJ's RFC finding lacks the support of substantial evidence because it does not adequately address Plaintiff's visual impairment. The Commissioner contends the ALJ did not err, and, in the case of Plaintiff's first argument, even if the ALJ did err, any such error was harmless. For the reasons discussed below, the undersigned recommends the ALJ's decision be affirmed.

Hearing Limitations

Plaintiff first argues the ALJ erred in failing to explain why the hearing restrictions in the RFC determination are less restrictive than those determined by a prior ALJ. The Commissioner responds that the ALJ did not err, but even if he did, any such error was harmless. The undersigned agrees with the Commissioner than Plaintiff has not shown any harmful error.

The RFC from Plaintiff's prior decision included a restriction stating: "He must avoid work in a noisy environment. He must avoid moderate exposure to moderate noise[.]" (Tr. 83). By contrast, the current ALJ's RFC limited Plaintiff to "a moderate noise environment." (Tr. 20). The VE testified, in response to a hypothetical question that matched the RFC, that that Plaintiff could perform jobs such as cashier (with 800,000 jobs nationally), sales attendant (with 210,000 jobs nationally), and routing clerk (with 41,000 jobs nationally). (Tr. 71). When asked whether adding a restriction to the hypothetical to "reduce the noise to avoiding even moderate exposure" (Tr. 72) (such as in the prior decision's RFC), the VE testified the cashier and sales attendant jobs would be eliminated, but the individual could still perform the routing clerk job (Tr. 73).

In *Free v. Social Security Administration*, 690 F. App'x 394, 395 (6th Cir. 2017), an ALJ found that the claimant could perform the jobs of packager and cleaner. The claimant argued that the VE's testimony concerning these jobs conflicted with the DOT requirements. *See id.* Although the Sixth Circuit concluded that the DOT requirements for the packager job did not conflict with claimant's RFC, the government conceded that the claimant's RFC would not permit him to perform the cleaner job. *Id.* at 395-96. The court, however, did not remand the case to the Commissioner in light of its finding that the claimant could not perform the cleaner job. Rather, it looked to the remaining packager job and concluded: "Because the vocational expert identified over 400,000 packaging jobs nationwide that Free could perform, substantial evidence supports

11

the ALJ's finding that Free is not disabled." *Id.* at 396. The court therein cited *Poe v. Commissioner of Social Security*, 342 F. App'x 149, 157-58 (6th Cir. 2009), which held that an ALJ's erroneous reliance on one of the jobs identified by a VE was harmless because the expert otherwise identified a significant number of jobs in the national economy that the claimant could perform and *Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016), which held that that 6,000 jobs nationwide "fits comfortably within what this court and others have deemed 'significant'". *See id.* Furthermore, in *Nejat v. Commissioner of Social Security*, the Sixth Circuit held that, even assuming an ALJ's RFC precluded two of the three jobs identified by the VE, a third job with 2,000 positions demonstrated "significant job opportunities" were available to the claimant. 359 F. App'x 574, 579 (6th Cir. 2009) ("Even if we agree that the ALJ's finding included jobs precluded by Nejat's exertional and non-exertional limitations, the ALJ's count of 2000 jobs available in the third category withstands Nejat's challenge.").

Applying *Free*, another district court found a VE's testimony that an individual with the plaintiff's RFC could perform the job of weights measure checker – with 45,000 such jobs existing in the national economy – "constitute[d] substantial evidence supporting the ALJ's finding that plaintiff was capable of performing 'other work that exists in significant numbers in the national economy'", even if the ALJ's determination also erroneously relied on two other jobs identified by the VE. *Duncan v. Comm'r of Soc. Sec.*, 2019 WL 6798917, at *3 (S.D. Ohio).

Thus, even assuming the ALJ erred in not explaining the hearing differences between the two RFCs, any such error was harmless. The VE stated that even including the restriction Plaintiff identifies, an individual could still perform the identified routing clerk job. (Tr. 73). The VE stated (Tr. 71), and the ALJ cited in his decision (Tr. 25), that there are 41,000 of such jobs nationally. This testimony constitutes substantial evidence to support the ALJ's finding that "there are other

12

jobs that exist in significant numbers in the national economy that the claimant can perform" (Tr. 24). As such, any error in the ALJ's failure to include such a limitation in the RFC is harmless. *See Free*, 690 F. App'x at 396.[2]

Vision Limitations

Second, Plaintiff argues the ALJ failed to properly account for his vision limitations. Specifically, he contends that "[w]hile the ALJ found that Plaintiff's bilateral cataracts with loss of visual efficiency and ptosis of the left eyelid were severe impairments, his RFC finding does not address the impact of these impairments on Plaintiff's functional ability". (Doc. 12, at 17). He contends the underlying evidence of record showed Plaintiff had worsening visual acuity, as well as worsening ptosis of the left eye and new ptosis of the right eye. *Id.* The Commissioner responds that Plaintiff has not satisfied his burden to show he requires more restrictive functional limitations than those set forth by the ALJ. (Doc. 15, at 10-12). In Reply, Plaintiff contends the ALJ erred in failing to consider a worsening of Plaintiff's limitations. (Doc 17, at 3). He further counters that the functional impact of his visual impairments is not "unidentified" as described by the Commissioner, but rather "[t]he record supports identifiable RFC limitations regarding loss of visual efficiency . . . and limited far acuity in both eyes according to the State agency medical consultants." *Id.* at 4. For the reasons discussed below, the undersigned finds the ALJ's analysis of Plaintiff's visual limitations supported by substantial evidence and recommends it be affirmed.

The ALJ addressed Plaintiff's eye issues as follows:

---

2. Plaintiff contends that "ultimately the determination of whether a particular number of jobs is significant should be left to the fact finder's common sense in weighing the statutory language as applied to particular situations." (Doc. 17, at 2-3). The Sixth Circuit in recent cases has not, however, taken this approach, but rather as described above has at various times made a determination about whether a certain number of jobs is significant even after certain jobs identified by the ALJ are excluded. *See Free*, 690 F. App'x at 396; *Nejat*, 359 F. App'x at 579.

13

> In regards to his bilateral cataracts with loss of visual efficiency, he reports that his vision is getting worse on a gradual basis (Hearing Testimony). The record shows that he was diagnosed with having cataracts in both eyes in 2016 (Exhibit B8F/2). Yet, he has not undergone surgery for this condition, and his vision issues continue to be treated with prescription eyeglasses (Exhibit B11F).
>
> In regards to his ptosis, he reports that his left eye stays closed for periods of time. He estimated that it stays shut for 70% of the time, as it will stay that way for 30-to-60 minutes at a time (Hearing Testimony). The record shows that he was initially diagnosed with blepharospasm in 2016 due to the spasms in that eye. This was treated with Botox injections (Exhibits B8F/2, and B16F). Later that same year, he reported that his left eyelid had been drooping despite Botox injection treatments (Exhibit B12F/1), and was diagnosed with ptosis (Exhibit B21F/12). Yet, the record shows a history of issues with that eye, including a previous TIA/stroke with left weakness and history of blepharoplasty OS. Also, physical examinations in 2017 have indicated there are no changes in the condition of this impairment and that it is stable (Exhibits B19F/7 and B20F/2 and 4).

(Tr. 21). The ALJ also noted that "[w]hile Plaintiff drives limited distances and does not drive on the freeways or at night, he has a valid driver's license and is able to drive his mother around, such as with grocery shopping." (Tr. 22). Further, earlier at Step Two, the ALJ explained that Plaintiff did not meet Listing 2.04 regarding loss of visual efficiency because "the claimant does not have loss of visual efficiency (visual efficiency percentage of 20 or less after best correction), or visual impairment (visual impairment value of 1.00 or greater after best correction), in the better eye" as required by the listing. (Tr. 20). As noted above, the State agency physicians (the only opinion evidence of record), opined in September and December 2016 that Plaintiff was "limited to frequent" driving due to his left eye ptosis. (Tr. 105, 135). The ALJ, in evaluating this opinion evidence, found "the degrees of the limitations and the wording of the limitations [herein] are different than what I have found based on the updated record, which the consultants did not have when they provided their opinions." (Tr. 22). The Commissioner correctly points out that the ALJ's RFC limited Plaintiff to occasional – rather than frequent – operation of a motor vehicle, a more restrictive finding than the State agency physicians. *See* Doc. 15, at 11 (citing Tr. 20).

14

Plaintiff bears the burden of demonstrating the need for a more restrictive RFC. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). Absent functional assessments from treating doctors, RFC assessments from medical reviewers is the best evidence of plaintiff's abilities and limitations. *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x. 290, 294 (6th Cir. 2006).

The ALJ here explained Plaintiff's cataracts were treated with prescription glasses, rather than surgery (Tr. 21) (citing Tr. 515-32), and that physical examinations in 2017 indicated Plaintiff's left eye ptosis was stable (Tr. 21) (citing Tr. 650, 652, 683). This is a substantially supported evaluation of the record. *See* Tr. 650 (June 2017 – "[n]o change in ptosis"); Tr. 683 (February 2018 – ptosis noted to be "stable"); Tr. 681 (February 2018 – Plaintiff's self-report that his ptosis was "about the same"); *see also Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993) (reviewing court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility.") (citations omitted)). Although there may also be evidence to support that Plaintiff is more limited, this Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Plaintiff contends the ALJ's "limitation on his driving ability is insufficient to accommodate far acuity deficits in both eyes", but he provides no opinion evidence in support, nor does he identify what additional restriction was required. Indeed, the only opinion evidence of record, from the state agency physicians, found that no further restriction was needed – they recognized Plaintiff had limited far acuity in his eyes (Tr. 104, 135), and a severe impairment of loss of visual efficiency or visual impairment (Tr. 102, 132), and the only visual limitation to which they opined was a limitation to frequent driving (Tr. 105, 135). Moreover, although Plaintiff argues it is "unclear from the ALJ's decision why Plaintiff has deficits in his ability to see 20 feet or more when he is operating a motor vehicle but under no other conditions" (Doc. 17, at 5), it is Plaintiff's

15

burden at Step Four to establish work-related RFC limitations. *See Jordan*, 548 F.3d at 423. And he has not done so. The undersigned notes that Plaintiff points to no evidence from a physician opining he required a specific work-related limitation due to his vision problems, and although Plaintiff certainly testified to difficulty with the ptosis and the vision in his left eye (*see* Tr. 49-50, 63-65), he only identified driving as a limitation resulting therefrom (*see* Tr. 41). It does appear that Plaintiff's vision worsened somewhat over time. *Compare* Tr. 402 (May 2016 – corrected near vision 20/20 in both eyes, corrected distance vision 20/25 in the left eye and 20/30 on the right), *with* Tr. 685 (September 2017 – corrected vision 20/40 in right eye, 20/50-2 in the left), Tr. 682 (February 2018 – corrected vision 20/50 right eye, 20/60 left eye). But again, Plaintiff has not demonstrated what specific functional impact this would have on his ability to work.[3]

Plaintiff, in essence, asks this Court to re-weigh the evidence of record and reach a different conclusion than the ALJ did. In so doing, he simply cites his treatment records. *See* Doc. 12, at 17. And, although Plaintiff contends his condition has worsened, he does not point to any specific limitation the ALJ should have included but did not. As discussed above, the ALJ's evaluation of the record is supported by substantial evidence and therefore this Court should affirm.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.

---

3. As another court explained addressing vision issues, a claimant who "demonstrated correctable visual acuity of 20/60 in his right eye" had what "the American Optometric Association defines as 'mild vision loss or near-normal vision.'" *Dematteo v. Astrue*, 2010 WL 1904025, at *4 (W.D. Pa.) (citing Am. Optometric Ass'n, "Low Vision", *available at*: http://www.aoa.org/low-vision.xml).

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).